**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **JOSEPH CALLOWAY, JR., *et al.*** | CIVIL ACTION |
| **versus** | No.  07-1101 |
| **NEIL ABBOTT, *et al.*** | SECTION: I/4 |

<u>**FINDINGS OF FACT AND CONCLUSIONS OF LAW**</u>

Plaintiffs, Joseph Calloway, Jr., Wanda Calloway, and Bryanna Calloway,[1] filed the above-captioned lawsuit[2] asserting causes of action pursuant to 42 U.S.C.A. § 1983.[3]  The non-jury trial in the above-captioned matter concluded on March 10, 2008.

<u>**BACKGROUND**</u>

The undisputed testimony presented at trial establishes that, on February 26, 2006, plaintiffs were attending a Mardi Gras parade in Houma, Louisiana.

<u>**WANDA CALLOWAY**</u>

Plaintiff, Wanda Calloway ("Mrs. Calloway"),[4] testified that she and her family arrived at the parade route at approximately 12:30 p.m..[5]  Mrs. Calloway testified that while awaiting the

---

[1]Bryanna Calloway is the minor child of Joseph and Wanda Calloway.

[2]Rec. Doc. No. 1.

[3]Plaintiffs concede that they are only asserting causes of action pursuant to 42 U.S.C.A. § 1983 and that they are not asserting supplemental state law claims against defendants.  Rec. Doc. No. 23.

[4]Joseph Calloway's wife.

[5]Trial Transcript p. 13.

arrival of the parade, plaintiffs were approached by defendant, Houma police officer Neil Abbott ("Abbott").[6]

According to Mrs. Calloway, Abbott requested that plaintiff, Joseph Calloway, Jr., ("Mr. Calloway"), move his vehicle to an authorized parking area.[7]   After Mr. Calloway complied with Abbott's request, Abbott returned to his post in the middle of the street, near the location where plaintiffs were awaiting the parade.

Mrs. Calloway testified that after the initial encounter with Abbott, three men and two young women approached plaintiffs and stood directly in front of them on the parade route.[8]  Immediately prior to these individuals standing in front of plaintiffs, Mrs. Calloway witnessed one of the three men speaking with Abbott in the middle of the road.[9]

After Mrs. Calloway told these individuals that she and her family were first at that location, one of the three men turned and began arguing with and cursing at Mr. Calloway.[10]  According to Mrs. Calloway, while her husband was arguing with this man, the other

---

[6]*Id.* at p. 16.

[7]*Id.*

[8]*Id.* at p. 17.

[9]*Id.*

[10]*Id.* at 17-18.   Mrs. Calloway testified that the individual that began arguing with Mr. Calloway was the same individual that had just talked with Abbott in the street.   *Id.* at 17.

two men removed their shirts, as if they were preparing for a fight.[11]

Mrs. Calloway testified that after she told Mr. Calloway that their daughter was getting upset, Mr. Calloway stated, "I don't have time for this" and he told Mrs. Calloway that the couple should leave and he would get a cigarette from their vehicle.[12] Mrs. Calloway testified that plaintiffs then left the area where the crowd was standing and they began walking toward their vehicle.[13]

After Mr. Calloway retrieved a cigarette from the passenger side of the Calloways' pickup truck, Mr. and Mrs. Calloway began walking back to where the crowd was standing.  Mrs. Calloway testified that after she and Mr. Calloway created some distance between themselves and their vehicle, Mr. Calloway attempted to light his cigarette.[14]  Suddenly, Abbott came running through the crowd and struck Mr. Calloway in the chest with such force that Mr. Calloway dropped his cigarette and lighter.[15]

Mrs. Calloway testified that after Abbott struck Mr. Calloway in the chest, Mr. Calloway asked Abbott to explain why he had

---

[11]*Id.* at p. 18.

[12]*Id.*

[13]*Id.*

[14]*Id.* at pp. 19, 22.

[15]*Id.* at pp. 22, 24.

punched him and he told Abbott that he had done nothing wrong.[16] Mrs. Calloway also testified that both she and the crowd viewing the incident told Abbott that Mr. Calloway was "the wrong man."[17] Mrs. Calloway testified that Abbott responded to her and to the crowd by telling them both to "shut the f--- up."[18]

According to Mrs. Calloway, Abbott then brandished his baton, which Mrs. Calloway referred to as a "billy."[19]  Mrs. Calloway testified that Abbott returned his baton to its holster after Mr. Calloway exclaimed that he was under medical treatment.[20]

Mrs. Calloway testified that after Abbott reholstered his baton, he removed a can of chemical spray from his belt and, in a "fan" like motion, sprayed Mr. Calloway, Mrs. Calloway, and their daughter, Bryanna Calloway ("Bryanna").[21]  Mrs. Calloway testified that after Abbott sprayed plaintiffs, Mrs. Calloway heard Abbott call on his radio, "officer down."[22]

According to Mrs. Calloway, after Abbott sprayed Mr. Calloway,

---

[16]*Id.* at p. 24.

[17]*Id.* at pp. 25-26.

[18]*Id.* at p. 26.

[19]*Id.*

[20]*Id.*

[21]*Id.* at p. 27.  Mrs. Calloway testified that she and Bryanna were standing at Mr. Calloway's side during his altercation with Abbott.

[22]*Id.*

-4-

he went behind Mr. Calloway in order to place him in handcuffs.[23]
Mrs. Calloway testified that by this time, there were "officers
everywhere."[24]

The officers walked Mr. Calloway to his pickup truck and,
according to Mrs. Calloway, Abbott attempted to slam Mr. Calloway's
head into the tailgate of the vehicle.[25]  However, Mrs. Calloway
testified that Abbott did not slam Mr. Calloway's head because Mr.
Calloway placed his foot on the bumper of his vehicle.[26]

Once Mr. Calloway was handcuffed, officers escorted him to a
police vehicle and transported him to the Houma police department.
Later that day, Mrs. Calloway bailed Mr. Calloway out of jail.
Eventually, the district attorney's office dropped all charges
arising from Mr. Calloway's arrest.

Although Mrs. Calloway testified that she and her daughter
suffered injuries as a result of this incident, she testified that
most of the chemical spray was directed at Mr. Calloway.[27]

**JOSEPH CALLOWAY, JR.**

Similar to Mrs. Calloway, Mr. Calloway testified that Abbott
instructed Mr. Calloway to move his pickup truck to an authorized

---

[23]*Id.* at p. 28.

[24]*Id.* at pp. 28-29.

[25]*Id.* at p. 29.

[26]*Id.*

[27]*Id.* at p. 50.

parking area.[28]  Mr. Calloway also testified that prior to the start
of the parade, three men and two women stood directly in front of
plaintiffs on the parade route.[29]  Mr. Calloway testified that prior
to these people standing in front of plaintiffs, he witnessed one
of the men speaking with Abbott.[30]

According to Mr. Calloway, after Mrs. Calloway told these
people that what they were doing was wrong, the largest of the
three men turned and began arguing with and cursing at Mr.
Calloway.[31]   The other two men removed their shirts and began
shouting that they wanted to fight.[32]

Rather than escalate the argument, Mr. Calloway and his wife
returned to their vehicle to get some cigarettes.[33]  Mr. Calloway
testified that after retrieving his cigarettes, he locked his
vehicle and he and Mrs. Calloway began walking back toward where
the crowd was standing.[34]

Mr. Calloway testified that before being struck by Abbott, he
saw Abbott running through the crowd, passing by the three men that

---

[28]*Id.* at p. 58.

[29]*Id.* at p. 57.

[30]*Id.* at pp. 58-59.

[31]*Id.* at pp. 57-58.

[32]*Id.* at p. 59.

[33]*Id.* at p. 60.

[34]*Id.*

started the above-referenced argument with Mr. Calloway.[35] According to Mr. Calloway, just as he was about to light his cigarette, "it was like a flash" and Abbott *pushed* Mr. Calloway "dead in my chest."[36]

Mr. Calloway testified that after being struck, he asked Abbott to explain why Abbott had hit him and why he was being arrested.[37] According to Mr. Calloway, Abbott responded by telling Mr. Calloway to "shut the f--- up" and that he was under arrest.[38]

According to Mr. Calloway, Abbott then brandished his baton[39] and swung it around.[40] Mr. Calloway testified that he had his hands open and again asked why Abbott hit him and what did he, i.e., Mr. Calloway, do to get arrested.[41] Abbott then reholstered his baton, retrieved his chemical spray, and sprayed Mr. Calloway in the face.[42] Mr. Calloway testified that Mrs. Calloway and Bryanna were standing directly next to him when Abbott deployed his chemical spray.[43]

---

[35]*Id.* at p. 61.

[36]*Id.*

[37]*Id.* at p. 62.

[38]*Id.*

[39]Mr. Calloway referred to Abbott's baton as "that long, black stick."

[40]*Id.*

[41]*Id.* at pp. 62-64.

[42]*Id.* at p. 64.

[43]*Id.* at p. 66.

After using his chemical spray, Abbott began moving Mr. Calloway toward his pickup truck.[44] At this point, Abbott had only placed one handcuff on Mr. Calloway.[45]

According to Mr. Calloway, Abbott attempted to slam Mr. Calloway's head into the tailgate of his pickup truck, but Mr. Calloway placed his foot on the vehicle's bumper to stop that from happening.[46] Abbott was assisted in placing the other handcuff on Mr. Calloway's free hand.[47]

Mr. Calloway testified that once he was handcuffed, he was escorted by the officers to a police vehicle and, thereafter, he was transported to the Houma police department.[48] Mr. Calloway was provided with cold compresses for his face while at the Houma police department.[49] The charges filed against Mr. Calloway as a result of his arrest were eventually dismissed.[50]

Although Mr. Calloway testified that his eyes and nose burned for several days after the incident, Mr. Calloway provided no medical evidence to establish a causal connection between the

---

[44]*Id.*

[45]*Id.*

[46]*Id.* at pp. 66-67.

[47]*Id.* at p. 67.

[48]*Id.* at pp. 68-69.

[49]*Id.* at p. 68-69.

[50]*Id.* at p. 69.

incident with Abbott and medical conditions with which Mr. Calloway now allegedly suffers.

Mr. Calloway was detained for approximately two and a half (2 ½) to three and a half (3 ½) hours from the time he was placed in the police vehicle until the time of his release.[51]

Mr. Calloway testified that he has been emotionally affected by this incident.  According to Mr. Calloway, as a result of the incident, he has had difficulty sleeping, he is jumpy, and he is quick to argue with his wife and daughter.[52]

**ERIC ADAMS**

Eric Adams ("Eric"), an independent truck-driver, testified as a witness to the incident between Abbott and Mr. Calloway.  Eric came forward and offered his testimony, notwithstanding the fact that he suffered a financial loss in order to appear in court.[53]

Eric testified that he attended the parade on February 26, 2006, with his brother, Billy Adams, and his brother's family.[54] Eric and his brother's family were standing in the same area as Mr. and Mrs. Calloway.

---

[51]*Id.* at pp. 91-92.

[52]*Id.* at p. 76.

[53]Eric testified that he came forward to testify notwithstanding the fact that he lost approximately $5200 dollars in order to appear and testify at trial. *Id.* at pp. 111-112.

[54]*Id.* at p. 103.

While waiting for the parade, Eric heard a commotion and he and his brother went to investigate.[55]   Eric testified that it appeared that there was a group of people trying to force Mr. Calloway and his family out of the area.[56]  According to Eric, Mr. Calloway asked these people if they would move to the side so that everyone could see the parade.[57]

Eric testified that the men in the group began arguing with Mr. Calloway and a heated discussion began.[58]  The men in the group acted as if they wanted to fight Mr. Calloway, but Mr. Calloway was not acting in a threatening manner.[59]

Eric testified that soon after the argument began, Abbott approached the area where Eric and plaintiffs were standing, and Abbott talked to the group of men that stood in front of plaintiffs.[60]  Mr. Calloway was not near the crowd while Abbott was talking to the group of men because he had returned to his truck to get cigarettes.[61]

---

[55]*Id.* at p. 105.

[56]*Id.* at p. 106.

[57]*Id.*

[58]*Id.*

[59]*Id.*

[60]*Id.* at p. 107.

[61]*Id.*

According to Eric, when Mr. Calloway returned from getting his cigarettes, Abbott was standing in the middle of the street, brandishing his baton,[62] and yelling at Mr. Calloway.[63]  Eric testified that while Abbott was yelling at Mr. Calloway, Mr. Calloway had his hands in the air, asking Abbott to explain what Mr. Calloway did that was wrong.[64]  At this point, Mrs. Calloway and Bryanna were by Mr. Calloway's side.

Eventually, Abbott reholstered his baton and removed his can of chemical spray.[65]  Eric testified that Abbott was 6-10 feet from the Calloways when he began spraying.[66]  Eric testified that Abbott began moving his hand side to side, deploying chemical spray, and that although all three plaintiffs were sprayed, it appeared that Abbott was not intentionally spraying anyone other than Mr. Calloway.[67]  According to Eric, Abbott did not, prior to using his chemical spray, instruct Mrs. Calloway and Bryanna to stand to the side.[68]

---

[62]Eric referred to Abbott's baton as a "black jack."

[63]*Id.*

[64]*Id.* at pp. 108, 120.

[65]*Id.*

[66]*Id.* at p. 117.

[67]*Id.* at pp. 108, 120.

[68]*Id.* at p. 108.

Eric testified that after spraying the Calloways, Abbott called on his radio and requested reinforcement.[69]  Eric further testified that once Abbott observed his fellow officers approaching, Abbott charged Mr. Calloway and struck him in the chest.[70]  Abbott then grabbed Mr. Calloway's arm, twisting it behind his back and, along with other officers, he began pushing Mr. Calloway toward his vehicle.[71]  According to Eric, if Mr. Calloway had not raised his foot to put it on the bumper of the vehicle, the officers would have slammed Mr. Calloway into the back of his pickup truck.[72]

Eric testified that after Abbott and other officers placed Mr. Calloway in a police vehicle, Eric attempted to speak to Abbott about the situation.[73]  Abbott told Eric that it was none of his business.[74]

Eric testified that he did not see Mr. Calloway acting in a physically or verbally threatening manner at any time before Mr.

---

[69]*Id.* at p. 109.

[70]*Id.*

[71]*Id.*

[72]*Id.*

[73]*Id.* at p. 110.

[74]*Id.*

Calloway was sprayed.[75]

### BRIDGETTE KIEFF

Bridgette Kieff ("Kieff"), an independent witness, was also at the Houma parade on February 26, 2006.  Kieff's testimony did not assist the Court as much as other independent testimony because her recollection of the incident did not appear to be as clear. Nevertheless, Kieff did testify that Mr. Calloway was not being hostile or threatening and that Mr. Calloway walked away from the confrontation on the parade route.[76]

Kieff testified that at some point after Mr. Calloway had pulled out a cigarette, she heard a young woman scream that Mr. Calloway was going to get a gun.[77]  At that time, Kieff testified that it was clearly visible that Mr. Calloway only had cigarettes in his hands.[78]

### BILLY ADAMS

Billy Adams ("Billy"), an independent truck-driver, testified as a witness to this incident.  Similar to Eric, Billy's appearance

---

[75]*Id.* at p. 113.

[76]*Id.* at p. 127.

[77]*Id.* at pp. 127-128.

[78]*Id.* at p. 128.

-13-

at trial was voluntary and caused a financial loss.[79]

Billy testified that when he first saw Abbott, the officer was in the middle of the street, brandishing his baton and yelling at Mr. Calloway.[80]  Billy testified that while Abbott was yelling at Mr. Calloway, Mr. Calloway had his hands in the air, asking Abbott to explain what he, i.e., Mr. Calloway, did that was wrong.[81]

According to Billy, Abbott reholstered his baton, removed his can of chemical spray, and began using his chemical spray in a side to side motion.[82]  Billy testified that as other police officers approached the scene, Abbott charged Mr. Calloway and struck him in the chest.[83]  Thereafter, the officers rushed Mr. Calloway toward his vehicle.[84]

Billy testified that Mr. Calloway had to place his foot on the bumper of his vehicle so as to avoid being slammed into the rear of the vehicle.[85]  Billy testified that Mr. Calloway never acted in a

---

[79]Billy testified that he came forward to testify notwithstanding the fact that he lost approximately $3500 dollars in order to appear and testify at trial. *Id.* at p. 146.

[80]*Id.* at p. 139.

[81]*Id.* at p. 140.

[82]*Id.*

[83]*Id.*

[84]*Id.*

[85]*Id.*

-14-

hostile or threatening manner.[86]

**MILTON WOLFE**

Lieutenant Milton Wolfe ("Wolfe") of the Houma police department, Internal Affairs, testified as to his investigation of the February 26, 2006 incident.  Such testimony was not particularly helpful as it simply summarized the investigation undertaken by Wolfe which resulted in Abbott being exonerated by the Houma police department.

Wolfe testified that if Mr. Calloway had his hands in the air, Abbott would not have been in compliance with Houma police department training when he sprayed Mr. Calloway.[87]  Wolfe also testified that the use of chemical spray is appropriate when the officer reasonably believes that, if the spray is not used, a physical threat will be directed toward the officer.[88]

**DARRYL CUNNINGHAM**

Darryl Cunningham ("Cunningham"), a Houma police officer, testified.[89]  However, Cunningham was not a witness to the events which preceded his assisting Abbott.  Cunningham did testify that upon arriving at the scene, he witnessed Mr. Calloway cursing,

---

[86]*Id.* at p. 142.

[87]*Id.* at p. 159.

[88]*Id.* at p. 160.

[89]*Id.* at p. 175.

-15-

yelling, and attempting to remove himself from Abbott's grasp.[90] Although he did not witness Abbott's use of chemical spray on Mr. Calloway, Cunningham testified that he could tell that chemical spray had been used because of the odor in the air.[91]

Mr. Calloway did not strike Cunningham, and Cunningham did not see Mr. Calloway strike Abbott. Cunningham assisted Abbott in handcuffing Mr. Calloway.

**NEIL ABBOTT**

Abbott presented a very different version of what occurred on February 26, 2006, at the Houma parade. Abbott has been a Houma police officer for approximately five (5) years, and he is trained in the use of force, including the PR24 baton, chemical spray, and firearms.[92]

According to Abbott, he first came into contact with Mr. Calloway when he instructed Mr. Calloway to move his vehicle to an authorized parking area.[93] Abbott testified that, after receiving orders from his parade supervisor, he instructed Mr. Calloway to move his vehicle.[94]

---

[90]*Id.* at p. 180.

[91]*Id.* at p. 182.

[92]*Id.* at pp. 194-197.

[93]*Id.* at p. 198.

[94]*Id.*

Abbott next encountered Mr. Calloway after several parade goers informed Abbott that there was a "black guy" near the location where plaintiffs were standing, and that he was going to get a gun from his truck.[95] Abbott testified that when he first approached Mr. Calloway's vehicle, Mr. Calloway was leaning into the vehicle on the passenger side.[96] Upon approaching Mr. Calloway at his vehicle, Abbott could tell that Mr. Calloway's hands were empty, but he was uncertain whether Mr. Calloway had a gun under his clothes or within arms reach, i.e., on the seat of his vehicle.[97]

Abbott testified that prior to approaching Mr. Calloway, Abbott was unaware that Mr. Calloway had been in a verbal altercation with several other parade spectators.[98] Abbott was at the rear of the Calloway vehicle in order to have cover when Mr. Calloway began walking toward him.[99] Abbott testified that as Mr. Calloway was walking toward him, Mr. Calloway was arguing with someone standing behind Abbott.[100]

------

[95]*Id.* at p. 201.

[96]*Id.*

[97]*Id.*

[98]*Id.* at p. 202.

[99]*Id.* at p. 203.

[100]*Id.*

Once Mr. Calloway was within arms reach of Abbott, Abbott placed his hand on Mr. Calloway's shoulder and asked Mr. Calloway to step away from the crowd so that Abbott could speak with him.[101] Abbott testified that Mr. Calloway responded to Abbott by slapping away Abbott's hand and punching him in the chest with a closed fist.[102]  Abbott testified that at the time, he was still "under the suspicion" that Mr. Calloway had a gun.[103]

After Mr. Calloway struck Abbott in the chest, Abbott drew his baton and informed Mr. Calloway that he was under arrest for battery of a police officer.[104]  Abbott testified that he realized the crowd was too thick for him to safely use his baton.[105]  Abbott reholstered his baton, removed his chemical spray, and sprayed Mr. Calloway in a "z" pattern.[106]

Prior to spraying Mr. Calloway, Abbott testified that Mrs. Calloway and Bryanna were standing between Abbott and Mr. Calloway. Abbott testified that he issued multiple verbal commands to Mrs.

---

[101]*Id.* at p. 204.

[102]*Id.*

[103]*Id.*

[104]*Id.* at p. 207.

[105]*Id.*

[106]Abbott testified that the "z" pattern is a method learned during police training.

-18-

Calloway, instructing her to step aside.[107]  According to Abbott, as soon as Mrs. Calloway and Bryanna stepped aside, Abbott sprayed Mr. Calloway.[108]

Chemical spray was necessary, according to Abbott, because Mr. Calloway disobeyed verbal commands and he kept pulling away from Abbott while he was trying to place Mr. Calloway under arrest.[109] After placing Mr. Calloway in a "rear arm-bar," Abbott escorted Mr. Calloway to his vehicle and awaited reinforcement.  Abbott testified that he never tried to slam Mr. Calloway's head, or any other part of Mr. Calloway's body, into his vehicle.[110]

Once Cunningham arrived on the scene and assisted Abbott in handcuffing Mr. Calloway, Mr. Calloway was escorted to a police vehicle and then transported to the Houma police department. Abbott testified that he did not intentionally spray Mrs. Calloway or Bryanna.

## STANDARDS OF LAW

Plaintiffs allege that Abbott's conduct constituted an excessive use of force and that it resulted in the unlawful arrest of Mr. Calloway.  "Claims concerning excessive force used during

---

[107]*Id.*

[108]*Id.*

[109]*Id.* at p. 209.

[110]*Id.* at p. 213.

-19-

and after an arrest implicate both the Fourth and the Fourteenth Amendment." *McNeil v. Cohen*, 2007 WL 1202312, at *5 (E.D. La. April 23, 2007) (McNamara, J.) (citing *Harper v. Harris County*, 21 F.3d 597, 600 (5th Cir. 1994); *Petta v. Rivera*, 143 F.3d 895, 911 n. 25 (5th Cir. 1998)).

## EXCESSIVE USE OF FORCE CLAIM

### FOURTH AMENDMENT[111]

Title 42, United States Code, Section 1983 provides that any citizen may seek redress in this Court by way of damages against any person who, under color of state law or custom, intentionally deprives that citizen of any rights, privileges, or immunities secured or protected by the constitution or laws of the United States.

In order to prove his claim, under this statute, Mr. Calloway must establish by a preponderance of the evidence each of the following elements:

> (1) defendant intentionally committed acts which operated to deprive Mr. Calloway of a right secured by the Constitution of the United States;[112]

> (2) defendant acted under color of the authority of the State of Louisiana; and

---

[111]*See* Fifth Circuit Pattern Jury Instructions (Civil), § 10.2 (West 2006).

[112]A plaintiff may not assert a Fourth Amendment excessive use of force claim based on a theory of transferred intent. *Bublitz v. Cottey*, 327 F.3d 485, 489 (7th Cir. 2003).

(3) that defendant's acts were the legal cause of Mr. Calloway's damages.

Neither party disputes that Abbott was acting under color of state law at the time of the acts complained about by Mr. Calloway.

In order to prove that Abbott used excessive force in violation of the Fourth Amendment, Mr. Calloway must prove by a preponderance of the evidence:

(1) some harm, that;

(2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was

(3) objectively unreasonable in light of the facts and circumstances at the time.

Factors that may be considered in determining whether Abbott used excessive force include:

(1) the extent of the injury suffered;

(2) the need for the application of force;

(3) the relationship between the need and the amount of force used;

(4) the threat reasonably perceived by the responsible officials; and

(5) any efforts made to temper the severity of a forceful response.

The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 hindsight.   The nature of reasonableness must

embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation.

The reasonableness inquiry is an objective one: the question is whether the officer's actions was objectively reasonable in light of the facts and circumstances confronting him, without regard to their underlying intent or motivation.

If Mr. Calloway proves his claim, the Court must consider Abbott's defense that his conduct was objectively reasonable in light of the legal rules clearly established at the time of the incident and that Abbott is, therefore, not liable.   Police officers are presumed to know about the clearly established constitutional rights of citizens.

Should the Court, after considering the scope of discretion and responsibility generally given to police officers in the performance of their duties, and after considering all of the surrounding circumstances of the case as they would have reasonably appeared at the time of the arrest, find from a preponderance of the evidence that Mr. Calloway has proved either (1) that Abbott was plainly incompetent; or (2) that Abbott knowingly violated the law regarding Mr. Calloway's constitutional rights, the Court must find in favor of Mr. Calloway.

-22-

If, however, the Court finds that Abbott had a reasonable belief that his actions did not violate Mr. Calloway's constitutional rights, the Court cannot find Abbott liable even if Mr. Calloway's rights were in fact violated as a result of Abbott's objectively reasonable action.

Mr. Calloway must also prove by a preponderance of the evidence that the act or failure to act by Abbott was a cause-in-fact of the damage that Mr. Calloway suffered.  An act or failure to act is a cause-in-fact of an injury or damages if it appears from the evidence that the act or omission played a substantial part in bringing about or actually causing the injury or damages. Mr. Calloway must also prove by a preponderance of the evidence that the act or failure to act by Abbott was a proximate cause of the damage that Mr. Calloway suffered.  An act or omission is a proximate cause of a plaintiff's injuries or damages if it appears from the evidence that the injury or damage was a reasonably foreseeable consequence of the act or omission.

## **FOURTEENTH AMENDMENT**

In light of the fact that Mrs. Calloway and Bryanna were innocent bystanders during the February 26, 2006 incident, their excessive force claims are governed by the Fourteenth Amendment to the United States Constitution.  *See McNeil*, 2007 WL 1202312, at *5 (quoting *Petta v. Rivera*, 143 F.3d  895, 911, n. 25 (5th Cir.

-23-

1998)).[113]   The Fourteenth Amendment provides in pertinent part that no State shall "deprive any person of life, liberty, or property, without due process of law . . . ."  U.S. Const. Amend. IV.

In order to establish Fourteenth Amendment excessive force claims, Mrs. Calloway and Bryanna must demonstrate that Abbott's "'actions caused [Mrs. Calloway and Bryanna] any injury,[114] were grossly disproportionate to the need for action under the circumstances, and were *inspired by malice rather than merely careless or unwise excess of zeal* so that it amounted to an abuse of official power that shocks the conscience."  *Id.* (quoting *Petta*, 143 F.3d at 902) (internal citations omitted).

A government official's mere negligence is insufficient to give rise to a constitutional violation under the Fourteenth Amendment.  *Bublitz v. Cottey*, 327 F.3d 485, 491 (7th Cir. 2003) (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 852, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)).  "Liability for negligently inflicted harm is categorically beneath the threshold of

---

[113]Where a plaintiff's excessive force claim, whether he be a prisoner, arrestee, detainee, or an innocent bystander of tender years, falls outside the specific protections of the Bill of Rights, that plaintiff may still seek redress under the due process clause of the Fourteenth Amendment.
*McNeil*, 2007 WL 1202312, at *5 (quoting *Petta*, 143 F.3d at 911, n. 25 (5th Cir. 1998).

[114]Just as with Fourth Amendment excessive force claims, purely psychological injuries may sustain a Fourteenth Amendment excessive force claim. *Petta*, 143 F.3d at 903; *see generally Flores*, 381 F.3d at 401 (citing *Petta*, 143 F.3d at 899-900).

constitutional due process." *Id.*

## <u>UNLAWFUL ARREST CLAIM</u>[115]

Under the Constitution of the United States, a citizen has both the right to his liberty and the right not to be arrested without due process of law.  A person may sue for an award of money damages against anyone who, "under color" of any State law or custom, intentionally violates his rights under the Constitution of the United States.

Mr. Calloway must prove each of the following elements by a preponderance of the evidence:

(1) That the defendant intentionally committed acts that violated one or more of the Mr. Calloway's Federal constitutional rights;

(2) That in so doing, the defendant acted "under color" of the authority of the State of Louisiana; and

(3) That the defendant's acts were the legal cause of the Mr. Calloway's damages.

As previously stated, the parties do not dispute that Abbott was acting under color of state law at all times pertinent to this lawsuit.

The Court must first decide whether Abbott committed the acts

---

[115]*See* Fifth Circuit Pattern Jury Instructions (Civil), § 10.1 (West 2006).  With respect to Section 1983 actions based on an allegedly unlawful arrest, "[i]f there was probable cause for any of the charges made . . ., then the arrest was supported by probable cause, and the claim for false arrest fails." *Wells v. Bonner*, 45 F.3d 90, 95 (5th Cir. 1995) (emphasis added).

that Mr. Calloway claims he committed; and, if so, the Court must then determine whether Abbott was acting within or beyond the bounds of his lawful authority under state law.  If Abbott acted within the limits of his lawful authority under state law, then he did not deprive Mr. Calloway of any right "without due process of law."

Louisiana law provides, "[a] peace officer may, without a warrant, arrest a person when the person to be arrested has committed an offense in his presence; and if the arrest is for a misdemeanor, it must be made immediately or on close pursuit."[116] La. C. Crim. P. Art. 213(A)(1).

According to Abbott's police report, Mr. Calloway was charged with violations of Louisiana Revised Statutes 14:103(A)(2)

---

[116]"Reasonable cause to arrest without a warrant is the equivalent of probable cause to obtain an arrest warrant."  *State v. Powell*, 598 So. 2d 454, 460 (La. App. 2 Cir. 1992) (citing *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959)); *see also State v. Hinojosa*, 2007 WL 3407732, at *4, n. 3 (La. App. 1 Cir. 2007).

With respect to mere investigatory stops, Louisiana law provides "[a] law enforcement officer may stop a person in a public place whom he reasonably suspects is committing, has committed, or is about to commit an offense and may demand of him his name, address, and an explanation of his actions."  La. C. Crim. P. Art. 215.1(A).

(disturbing the peace);[117] 14:108(A) (resisting arrest);[118] and 34.2A(1) (battery of a police officer).[119]   Pursuant to Louisiana law, violations of these statutes are classified as misdemeanor offenses.[120]

---

[117]La. Rev. Stat. Ann. § 14:103(A)(2) provides:
Disturbing the peace is doing any of the following in such a manner as would foreseeably disturb or alarm the public:
Addressing any offensive, derisive, or annoying words to any other person who is lawfully in any street, or other public place; or call him by any offensive or derisive name, or make any noise or exclamation in his presence and hearing with the intent to deride, offend, or annoy him, or to prevent him from pursuing his lawful business, occupation, or duty.

[118]La. Rev. Stat. Ann. § 14:108(A) provides:
Resisting an officer is the intentional interference with, opposition or resistance to, or obstruction of an individual acting in his official capacity and authorized by law to make a lawful arrest, lawful detention, or seizure of property or to serve any lawful process or court order when the offender knows or has reason to know that the person arresting, detaining, seizing or serving process is acting in his official capacity.

[119]La. Rev. Stat. Ann. § 14:34.2(A)(1) provides:
Battery of a police officer is a battery committed without the consent of the victim when the offender has reasonable grounds to believe the victim is a police officer acting in the performance of his duty.
The essential elements of the crime of battery of a police officer include:
(1) the intentional use of force or violence upon the person of a police officer;
(2) without the consent of the victim; and
(3) when the offender has reasonable grounds to believe the victim is a police officer acting in the performance of his duty.
*State v. Gardner*, 907 So. 2d 793, 799 (La. App. 5 Cir. 2005) (citing *State v. Breaux*, 829 So. 2d 463, 468 (La. App. 5 Cir. 2002)).

[120]Louisiana law defines a "misdemeanor" as any crime other than a felony. La. Rev. Stat. Ann. § 14:2(A)(5).  A "felony" is any crime for which an offender may be sentenced to death or imprisonment at hard labor.  La. Rev. Stat. Ann. §14:2(A)(4).
Of the three crimes J. Calloway was charged with, none impose a penalty of death or imprisonment at hard labor.  Disturbing the peace carries a penalty of a fine of not more than one hundred dollars ($100) or imprisonment for not more than six months, or both.  La. Rev. Stat. Ann. § 14:103(B)(2).  Resisting arrest carries a penalty of a fine of not more than five hundred dollars ($500) or imprisonment for not more than six months, or both.  La. Rev. Stat. Ann. §

-27-

Louisiana law also provides that an individual has the right to resist either an unlawful detention or an unlawful arrest. *State v. Manuel*, 946 So. 2d 245, 248 (La. App. 4 Cir. 2006; *Gray v. Horton*, 2008 WL 170664, at *4 (W.D. La. Jan. 18, 2008).

## MUNICIPAL LIABILITY[121]

In addition to their claims against Abbott, plaintiffs are suing the Terrebonne Parish Consolidated Government ("TPCG") for Abbott's alleged misconduct.    It is well-settled that municipalities cannot be held liable pursuant to Section 1983 based on a theory of respondeat superior.  *See Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 416-417, 117 S. Ct. 1382, 1394, 137 L. Ed. 2d 626 (1997); *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003).   In order to recover against the TPCG, plaintiffs must show that the TPCG had a legal duty to act to prevent the misdeeds of Abbott and the TPCG's failure to act amounted to gross negligence or deliberate indifference of plaintiffs' rights.

A municipality is liable for the deprivation of a constitutional right if the deprivation was pursuant to

---

14:108(c).  Battery of a police officer that does not result in injury carries a penalty of a fine of not more than five hundred dollars ($500.00) and imprisonment for not less than fifteen days nor more than six months without benefit of suspension of sentence.  La. Rev. Stat. Ann. § 14:34.2(B)(1).

[121]*See* Fifth Circuit Pattern Jury Instructions (Civil), § 10.3 (West 2006).

governmental custom, policy, ordinance, regulation or decision.
Therefore, if plaintiffs' alleged injuries were the proximate or
legal result of the TPCG's policy, custom, ordinance, regulation or
decision, the TPCG, itself, will be held responsible for those
injuries.

### COMPENSATORY DAMAGES[122]

The purpose of compensatory damages is to make a plaintiff
whole – that is, to compensate the plaintiff for the damage that he
has suffered.   Compensatory damages are not limited to expenses
that a plaintiff may have incurred because of his injury.  If the
plaintiff wins, he is entitled to compensatory damages for the
physical injury, pain and suffering, mental anguish, shock, and
discomfort that he has suffered because of the defendant's conduct.

The Court may award compensatory damages only for injuries
that a plaintiff proves were proximately caused by the defendant's
allegedly wrongful conduct.  The damages that the Court awards must
be fair compensation for all of the plaintiffs' damages, no more
and no less.  The Court should not award compensatory damages for
speculative injuries, but only for those injuries which the
plaintiff has actually suffered or that the plaintiff is reasonably
likely to suffer in the future.

---

[122]*See* Fifth Circuit Pattern Jury Instructions (Civil), § 15.2 (West 2006).

The Court should be guided by dispassionate common sense. Computing damages may be difficult, but the Court must not let that difficulty lead it to engage in arbitrary guess-work.  On the other hand, the law does not require that the plaintiff prove the amount of his losses with mathematical precision, but only with as much definiteness and accuracy as the circumstances permit.  The Court must use sound discretion in fixing an award of damages, drawing reasonable inferences where the Court finds them appropriate from the facts and circumstances in evidence.

### PUNITIVE DAMAGES[123]

In addition to compensatory damages, the Court also may award punitive damages if plaintiffs have proved that Abbott acted with malice or willfulness or with callous and reckless indifference to the safety or rights of others.  One acts willfully or with reckless indifference to the rights of others when he acts in disregard of a high and excessive degree of danger about which he knows or which would be apparent to a reasonable person in his condition.

If the Court determines that Abbott's conduct was so shocking and offensive as to justify an award of punitive damages, the Court may exercise its discretion to award those damages.  In making any

---

[123]*See* Fifth Circuit Pattern Jury Instruction (Civil), § 15.13 (West 2006).

award of punitive damages, the Court should consider that the purpose of punitive damages is to punish a defendant for shocking conduct, and to deter the defendant and others from engaging in similar conduct in the future.

The law does not require the Court to award punitive damages; however, if the Court decides to award punitive damages, the Court must use sound reason in setting the amount of damages.

The amount of an award of punitive damages must not reflect bias, prejudice, or sympathy toward any party.  It should be presumed that a plaintiff has been made whole by compensatory damages, so punitive damages should be awarded only if the defendant's misconduct, after having paid compensatory damages , is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence.

### MR. CALLOWAY'S EXCESSIVE FORCE CLAIM

With respect to Mr. Calloway's claim, this case would be less difficult to decide if the testimony offered by the independent witnesses was more consistent with the sequence of events offered by plaintiffs.  Notwithstanding the inconsistencies in testimony, however, and for the reasons assigned, Mr. Calloway has, by a preponderance of the evidence, convinced the Court that Abbott used excessive force in connection with the events leading to Mr. Calloway's arrest.

Having heard and reviewed the trial testimony, the Court is convinced that Abbott cannot justify his use of chemical spray and physical force.  According to the Calloways, Abbott came running through the crowd, eventually striking Mr. Calloway in the chest and causing Mr. Calloway to lose hold of his cigarette and lighter. After Mr. Calloway asked Abbott why he had hit him, Abbott removed his baton, then returned it to his belt, removed chemical spray from his belt, and utilized a "z" pattern to spray Mr. Calloway's face.  Abbott then used his radio to call for reinforcement.

Both Billy Adams and Eric Adams testified that Mr. Calloway had his hands in the air as he asked Abbott to explain what he, i.e., Mr. Calloway, did that was wrong.  The Court was particularly impressed by the credibility of the Adams brothers, their reasons for testifying, and their straightforward demeanor.

Both of the Adams brothers and the other independent witness, Bridgette Kieff, testified that at all times relevant herein, Mr. Calloway never acted in a hostile or threatening manner.  It is clear from all three independent witnesses that prior to encountering Abbott, Mr. Calloway and his family peacefully retreated from any physical altercation with the three men located on the parade route.

Lieutenant Milton Wolfe testified that there must be a physical threat directed toward an officer before the use of

-32-

chemical spray or, presumably, physical force can be justified.

Judging what occurred from the perspective of a reasonable officer at the scene, as opposed to 20/20 hindsight, there was no need to strike Mr. Calloway in the chest or to spray him. Notwithstanding any inconsistencies in testimony, the Court is convinced that Mr. Calloway did not do anything to justify Abbott's unnecessary, unreasonable, and excessive use of force.

Although the Court believes that Abbott received information from a person(s) in the crowd that Mr. Calloway was going to get a gun, Abbott failed to investigate the tip, choosing to use unnecessary force without first encountering any threat from Mr. Calloway.  In doing so, he exceeded that degree of force which a reasonable and prudent law enforcement officer would have applied under similar circumstances.  The use of force initiated by Abbott, including the strike to Mr. Calloway's chest and the use of chemical spray, was clearly excessive as any use of force was unnecessary under the circumstances.  The Court finds that Abbott knowingly violated the Fourth Amendment to the United States Constitution.

## UNLAWFUL ARREST CLAIM

Based upon the Court's evaluation of the testimony presented, the Court finds that Abbott did not have probable cause to arrest Mr. Calloway for any of the three offenses for which Mr. Calloway

was arrested.[124]  Specifically, the Court finds that Abbott did not have reasonable cause to believe that Mr. Calloway disturbed the peace, committed a battery on a police officer, and/or resisted arrest.[125]  The credible evidence, as previously detailed, compels the conclusion that Mr. Calloway never intentionally used force or violence upon Abbott, never disturbed the peace as defined by Louisiana law, and never intentionally interfered with, opposed, resisted, or obstructed Abbott while Abbott was attempting to arrest or detain Mr. Calloway.[126]

### MR. CALLOWAY'S COMPENSATORY DAMAGES

Mr. Calloway testified that after being sprayed, his eyes and skin continued to burn for three (3) to four (4) days.[127]  Mr. Calloway stated that, even now, his eyes still get red.[128]  Mr. Calloway attributes this condition to the chemical spray used by

---

[124]Based on the Court's findings of fact herein, any claim by Abbott that he was conducting a lawful investigatory stop is rejected as unsupported by the evidence.

[125]With respect to the resisting arrest charge, the Court notes that Mr. Calloway did not resist arrest as defined by La. Rev. Stat. Ann. § 14:108(A), as Mr. Calloway did not commit any offense for which he could be legally arrested.

[126]Alternatively, Mr. Calloway had every right under Louisiana law to resist an unlawful restraint of his liberty.  *See Manuel*, 946 So. 2d at 245, 248 (La. App. 4 Cir. 2006); *see also Gray v. Horton*, 2008 WL 170664, at *4 (W.D. La. Jan. 18, 2008)

[127]Trial Transcript p. 71.

[128]*Id.*

Abbott.[129]

Despite his alleged ongoing eye condition, Mr. Calloway stated that he has never been examined by an ophthalmologist.[130] Furthermore, Mr. Calloway testified that Visine, a non-prescription eyedrop, is the only medication he used to treat the alleged effects of Abbott's chemical spray.[131]

Mr. Calloway also testified that upon arriving at the emergency room on February 26, 2006, the treating physician noticed that Mr. Calloway had a "hand print" on his chest.[132] According to Mr. Calloway, the emergency room physician gave Mr. Calloway an injection and some pain medication and instructed him to contact his family doctor.[133] However, Mr. Calloway did not provide any evidence that he visited the Calloways' family doctor as instructed.

Mr. Calloway stated that his chest problems continued after leaving the emergency room.[134] Mr. Calloway testified that as a result of being punched by Abbott, he required surgery to remove

---

[129]*Id.*

[130]*Id.*

[131]*Id.*

[132]*Id.* at p. 70.

[133]*Id.*

[134]*Id.* at p. 71.

"bruised blood in my chest."[135]

As previously stated, Mr. Calloway testified that he has also been emotionally affected by the February 26, 2006 encounter with Abbott.  Mr. Calloway testified that as a result of this encounter, he lost sleep, he is "jumpy," and he is argumentative with his wife and child.

The Court finds that Mr. Calloway has exaggerated the extent of his injuries.  The evidence presented is insufficient to establish a causal link between Abbott's use of excessive force and Mr. Calloway's alleged ongoing medical and emotional conditions. Plaintiffs' counsel, himself, stated on the record that Mr. Calloway's medical records were not presented at trial because said records did not contain, "any specific references to causation."[136] No medical evidence was presented which would support Mr. Calloway's claims of continued injury.

The Court finds that, as a result of any temporary and limited physical and emotional injuries[137] that Mr. Calloway may have suffered as a result of the constitutional violations committed by Abbott, Mr. Calloway is entitled to compensatory damages in the amount of $7,500.00.

---

[135]*Id.* at pp. 72-73.

[136]*Id.* at p. 73.

[137]Considered in the Court's award for emotional damages is the fact that Mr. Calloway was arrested and maced in front of his wife and young daughter.

## PUNITIVE DAMAGES

Although the Court has awarded compensatory damages in this case, it exercises its discretion not to award punitive damages. Although Abbott used force which was clearly excessive under the circumstances, Abbott had received information, confirmed by the testimony of Bridgette Kieff, that Mr. Calloway was going to retrieve a gun. Abbott also faced crowd and control issues because of the nature of the scene. Although Abbott initially removed his baton after striking Mr. Calloway, he returned it to his belt and opted for a lesser degree of force, i.e., chemical spray. The Court does not find that Abbott acted with malice or willfulness or with callous and reckless indifference to the safety and rights of others.

## MRS. CALLOWAY'S and BRYANNA CALLOWAY'S FOURTEENTH AMENDMENT CLAIMS

The Court finds that Mrs. Calloway and Bryanna have failed to prove, by a preponderance of the evidence, that Abbott violated their Constitutional rights. The Court finds that the evidence presented is insufficient to establish that Abbott's actions with respect to these plaintiffs were inspired by malice.

Eric Adams testified that it did not appear that Abbott directed the chemical spray against Bryanna or Mrs. Calloway. Any excess spray that may have hit Mrs. Calloway and Bryanna was a result of the "z" pattern used by Abbott. Mrs. Calloway, herself, testified that most of the chemical spray deployed by Abbott was

directed at Mr. Calloway.

Abbott's conduct with respect to Mrs. Calloway and Bryanna is best described as negligent, not malicious.  Considering the fact that mere negligence is insufficient to give rise to a constitutional violation under the Fourteenth Amendment and that Mrs. Calloway and Bryanna have not asserted state law causes of action for negligence,[138] the Court finds that Abbott is not liable for the damages suffered by these plaintiffs.  *Bublitz*, 327 F.3d at 491.

### TERREBONNE PARISH CONSOLIDATED GOVERNMENT

After reviewing the evidence presented, the Court finds that plaintiffs have failed to establish, by a preponderance of the evidence, municipal liability on behalf of the Terrebonne Parish Consolidated Government.  The Court finds that the evidence presented fails to establish that the aforementioned constitutional deprivations committed by Abbott were the product of governmental custom, policy, ordinance, regulation or decision.

Accordingly,

**IT IS ORDERED** that Joseph Calloway, Jr., be awarded compensatory damages in the amount of $7,500.00 and that any claim for punitive damages is **DENIED**.

**IT IS FURTHER ORDERED** that Wanda Calloway's and Bryanna

---

[138]Plaintiffs stipulate that they are not asserting state law causes of action.  Rec. Doc. No. 23.

Calloway's Section 1983 actions against Officer Neil Abbott are **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that plaintiffs' Section 1983 actions against Terrebonne Parish Consolidated Government are **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that counsel for the parties shall meet on or before **Thursday, April 3, 2008**, and attempt to settle any disputes concerning the amount of attorney's fees and costs to be awarded.[139]

Should counsel fail to reach a settlement, counsel for Joseph Calloway, Jr., shall file a motion and supporting memorandum regarding attorney's fees no later than **Monday, April 14, 2008, at 12:00 p.m.** and counsel for Neil Abbott shall file a response to said motion no later than **Monday, April 21, 2008, at 12:00 p.m.**, at which time the motion shall be submitted.

New Orleans, Louisiana, March 24th, 2008.

LANCE M. AFRICK
**UNITED STATES DISTRICT JUDGE**

---

[139]Title 42 United States Code, Section 1988(b) provides in pertinent part: In any action or proceeding to enforce a provision of section . . . 1983 . . ., the Court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs . . . .
See, e.g., Oyefodun v. City of New Orleans, 2001 WL 775574, at *7-9 (E.D. La. July 9, 2001) (Vance, J.); see also Fed. R. Civ. P. 54(d).